**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DURA GLOBAL TECHNOLOGIES, INC., )
DURA OPERATING CORP. )
　　　　　　　　　　　　　　　　　　)
Plaintiffs, 　　　　　　　　　　　　　) Civil Action No. 2:07cv10945-SFC-MKM
　　　　　　　　　　　　　　　　　　)
　　　v. 　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　) Hon. Judge Sean F. Cox
MAGNA DONNELLY CORPORATION, )
a/k/a DONNELLY CORPORATION 　　)
　　　　　　　　　　　　　　　　　　)
Defendant. 　　　　　　　　　　　　)

**OPINION AND ORDER CONSTRUING DISPUTED CLAIM TERMS**

**I.　　INTRODUCTION**

On July 22, 2010, the Court held a hearing to construe specific claim terms identified by the parties as being in dispute pursuant to *Markman v. Westview Instruments*, 517 U.S. 370 (1996). The parties submitted extensive written briefs in support of their positions both before and after the hearing. In this Opinion and Order, the Court will construe the disputed claim terms identified by the parties.

The Court's claim construction findings set forth in this Opinion and Order relate to the specific arguments and disputes raised by the parties in the context of the particular accused products at issue in this case. In resolving the claim construction disputes raised by the parties, the Court intended to narrowly resolve the claim construction disputes for this particular case. Accordingly, the Court does not intend that this Opinion and Order necessarily have collateral estoppel effect in future cases against different accused products. (July 22, 2010 Transcript at pgs. 111-114.)

## II.    FACTS

### A.    SUMMARY OF THE '769 AND '617 PATENTS

Plaintiffs Dura Global Technologies, Inc. and Dura Operating Corporation (hereinafter "Dura" or "Plaintiff") have asserted two patents against Defendant Magna Donnelly Corporation: U.S. Patent No. 5,724,769 ('769 Patent), entitled "Motor Vehicle Window Construction with Pull-Pull Cable," and U.S. Patent 6,766,617 ('617 patent), entitled "Power Sliding Rear Window."

The patents generally relate to a power slidable rear window for automobiles, typically the rear center window pane of a pickup truck cab.

The United States Patent and Trademark Office ("USPTO") issued the '769 patent on March 10, 1998.  The '769 patent lists five inventors.

The USPTO issued the '617 patent on July 27, 2004.  The '617 patent has one listed inventor.   The sole inventor listed on the '617 patent is not listed as an inventor of the '769 patent.

The '769 and '617 patents are generally unrelated, except for the fact that they are both owned by Dura and involve the same general technology area.

### B.    PROCEDURAL HISTORY

Magna previously filed four motions for summary judgment arguing non-infringement and invalidity of the '769 and '617 patents and filed a motion for judgment on the pleadings, all of which were denied by the Court in September of 2009.  (Doc. Nos. 345-349.)  Magna also filed two motions for reconsideration, which were also denied by the Court.  (Doc. Nos. 404-405.)  The Court's orders denying Magna's motions for summary judgment dealt with claim construction issues.  (Doc. Nos. 347 and 348.)

On or about October and December of 2009, Magna filed *ex parte* reexamination proceedings according to 35 U.S.C. § 302 in the USPTO against the '769 and '617 patents.[1] In the reexamination proceedings, Magna is attempting to invalidate certain claims in the '769 and '617 patents based on specific prior art.

Both reexamination proceedings have resulted in amendments and/or statements that are relevant to some of the claims at issue. The Court will address the amendments and arguments in this Opinion and Order to the extent that they are relevant to the disputed claim terms that the parties have requested that the Court construe.

## III.    LAW ON CLAIM CONSTRUCTION

Claims are short and concise statements, expressed with great formality, of the metes and bounds of the patented invention. Each claim is written in the form a single sentence. Claim construction is the manner in which courts determine the meaning of the terms in the claim. "The construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claim." *Scripps Clinic & Research Foundation v. Genentech, Inc*., 927 F.2d 1565, 1580 (Fed. Cir. 1991).

The construction of key terms in patent claims plays a critical role in nearly every patent infringement case. Claim construction is central to both a determination of infringement and validity of a patent.

The judge, not a jury, is to determine the meaning of the disputed claim terms as a matter of law. *Markman v. Westview Instruments*, 517 U.S. 370 (1996).

---

[1]  See reexamination Control No. 90/009,609 for the '617 patent and Reexamination Control No. 90/009621 for the '769 patent.

The Court has two primary goals in construing the disputed claim terms. The first goal is to determine the scope of the invention by interpreting the disputed claim terms to the extent needed to resolve the dispute between the parties. The second goal is to provide a construction that will be understood by the jury who might otherwise misunderstand a claim term in the context of the patent specification and prosecution history of the patent. *See, e.g., Power-One, Inc. v. Artesyn Technologies, Inc*., 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims."); *U.S. Surgical Corp. v. Ethicon, Inc*., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary, to explain what the patentee covered by the claims, for use in the determination of infringement."). The Court's claim construction ruling forms the basis for the ultimate jury instructions, although that is not to say that the Court cannot modify its wording for the jury instructions at a later date. *See IPPV Enters., LLC v. Echostar Commc'ns Corp.*, 106 F. Supp. 2d 595, 601 (D. Del. 2000).

The seminal case setting forth the principles for construing disputed claim terms is *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). According to *Phillips*, the words of the claim are generally given their ordinary and customary meaning – the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id*. at 1312-1313. The person of ordinary skill in the art views the claim term in light of the entire intrinsic record, which is the entire claim, the other parts of the patent, and, if in evidence, the prosecution history of the patent before the United States Patent and Trademark Office. *Id*. at 1313-1314. Although a claim must be construed in view of the entire patent, the court should normally not read

limitation or features of the exemplary embodiments discussed in the patent specification into the claims. *Id*. at 1323-1324.

The prosecution history of the patent can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention during the course of prosecution by his statements, making the claim scope narrower than it would otherwise be. However, because the prosecution history is an ongoing negotiation between the patent office and the patent owner, rather than the final product of that negotiation, it often lacks the clarity of the patent itself and is generally less useful for claim construction purposes. *Id*. at 1317.

In discerning the meaning of claim terms, resorting to dictionaries and treatises also may be helpful. *Id*. at 1320-1323. However, undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification of the patent and the prosecution history, thereby undermining the public notice function of patents. *Id*. In the end, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be the correct construction. *Id*. at 1316.

Since 2006, it has been settled law that it is proper for the Court to construe the disputed claim terms in the context of the infringement or invalidity dispute by viewing the accused device or prior art, which allows the Court to construe the claims in the context of the dispute between the parties, not in the abstract. "While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v.*

*Hillerich & Bradsby Co.*, 442 F.3d 1322 (Fed. Cir. 2006). The Federal Circuit has even held that without "the vital contextual knowledge of the accused products," a court's claim construction decision "takes on the attributes of something akin to an advisory opinion. . . ." *Lava Trading, Inc. v. Sonic Trading Management*, LLC, 445 F.3d 1348, 1350 (Fed. Cir. 2006). In fact, the Federal Circuit recently remanded a case that was on appeal of a consent judgment of infringement based on faulty claim construction because the record did not show the accused product or explain why, under the district court's claim construction, the accused product would not infringe. *Jang v. Boston Scientific Corp.*, 532 F.3d 1330, 1337-1338 (Fed. Cir. 2008).

## IV. CLAIM CONSTRUCTION ANALYSIS FOR DISPUTED CLAIM TERMS

The parties have requested that the Court construe a number of claim terms. The Court will address each disputed claim term in the following sections.

## A. "CIRCUMFERENTIAL FRAME" IN CLAIMS 16 AND 21 OF THE '769 PATENT AND "CIRCUMFERENTIAL FRAME MEMBER" IN CLAIMS 1, 4, 24, AND 26 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 1. "circumferential frame" ('769 Patent – Claims 16 and 21) | a frame at or near the periphery of the window that does not require a full-circumference member. | outer peripheral frame that forms a complete or substantially complete perimeter around the glazing panes (sliding pane along with one or more fixed panes) | a frame that forms a complete or substantially complete perimeter around the glazing panes (for example, a sliding pane and one or more fixed panes) and that is located at or near the periphery of the glazing panes |
| "circumferential frame member" ('769 Patent – Claims 1, 4, 24, and 26) | a frame member at or near the periphery of the window that does not require a full-circumference member. | Outer peripheral frame member that forms a complete or substantially complete perimeter around the | a frame member that forms a complete or substantially complete perimeter |

| | "member" means a "distinct part of a whole." | glazing panes (sliding pane along with one or more fixed planes) | around the glazing panes (for example, a sliding window pane along with one or more fixed window panes) and that is located at or near the periphery of the glazing panes |
| --- | --- | --- | --- |

The parties request that the Court construe the term "circumferential frame member" in Claims 1, 4, 24, and 26 and "circumferential frame" in Claims 16 and 21 of the '769 patent.

The relevant portions of Claims 1, 4, 24, and 26 containing the claim term "circumferential frame member" read as follows:

1. A motor vehicle window construction in a motor vehicle, comprising, in combination:

frame means mounted in a window recess in a vehicle body comprising **a circumferential frame member** with a first cable directional block integral with a lower horizontal portion of the frame member; . . . . (Emphasis added.)

4. A multi-pane window construction in a motor vehicle, the window construction comprising, in combination:

frame means mounted in a window opening of a motor vehicle body, comprising **a circumferential frame member** <u>having substantially vertical right and left portions interconnected by substantially horizontal upper and lower portions</u>, with a first cable directional block integral with the lower horizontal portion of the frame member; . . . . (Emphasis added.)

24. The window construction in accordance with claim 21 installed in a motor vehicle, further comprising an electrical switch suitable for mounting in the motor vehicle remote from the **circumferential frame member** and from the drive apparatus. (Emphasis added.)

26. A motor vehicle window construction in a motor vehicle, comprising, in combination:

frame means for mounting mounted in a window recess in the a vehicle body comprising **a circumferential frame member** with a first cable directional block contacting a lower horizontal portion of the frame member; . . . . (Emphasis added.)

The relevant portions of Claims 16 and 21 containing the claim term "circumferential frame" read as follows:

> 16. A retrofitting kit for retrofitting a manual-slide window construction installed in a motor vehicle to be power operated, the window construction comprising **a circumferential frame** and a transparent pane slidably mounted in **the frame** for sliding laterally back and forth between an open position and a closed position, the transparent pane having an inside surface facing a passenger compartment of the motor vehicle body and a peripheral edge including a horizontal lower edge portion slidingly received in a laterally extending slider travel channel **in a lower horizontal portion of the frame**, the retrofitting kit comprising: . . . . (Emphasis added.)

> 21. A window construction installed in a window opening of a motor vehicle body, comprising:

> **a circumferential frame** and a transparent pane slidably mounted in **the frame** for sliding laterally back and forth between an open position and a closed position, the transparent pane having an inside surface facing a passenger compartment of the motor vehicle body and a peripheral edge including a horizontal lower edge portion slidingly received in a laterally extending slider travel channel in **a lower horizontal portion of the frame**; . . . . (Emphasis added.)

An embodiment of the "circumferential frame" is illustrated in Figure 1 of the '769 patent with the reference number 18 which has been reproduced below.



**Fig. 1**

As mentioned above, a court is to construe the disputed claim term in the context of the accused device. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co*., 442 F.3d 1322 (Fed. Cir. 2006); *Lava Trading, Inc. v. Sonic Trading Management*, LLC, 445 F.3d 1348, 1350 (Fed. Cir. 2006). However, "a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process. . . ." *Id*. A photograph of Magna's accused product is shown below.



As can be seen above, Magna's accused device allegedly has a frame consisting of two parallel rails, one rail at the top of the windows and another rail at the bottom of the windows, that do not go around the entire outer periphery of the windows.

The Court previously construed the phrase "circumferential frame" in part in deciding a motion for summary judgment as to non-infringement of the '769 patent filed by Magna. (Doc. No. 347.) In denying Magna's motion for summary judgment, the Court rejected Magna's argument that "circumferential frame" should be construed to mean that the frame must necessarily surround the "entire" body of the windows because such a construction would be at odds with the preferred embodiment described in the specification and contrary to a definitional phrase in the written description.

Before addressing the parties' arguments, it must be noted at the outset that Dura improperly changed its proposed construction for this term in its reply brief from its opening brief. Dura should have articulated its claim construction position in its opening brief and, pursuant to this Court's scheduling order for patent cases, in its pre-briefing disclosures so that

Magna could respond to Dura's arguments in its response brief. Because the Dura failed to set forth its proposed claim construction, the Court allowed Magna to submit a sur-reply brief. Dura also filed amended claim construction positions at approximately 9:30 p.m. the night before the claim construction hearing, which Dura agreed need not be considered at the claim construction hearing. (July 22, 2010 transcript at pgs. 111-114.)

Dura argues in its reply brief that "a circumferential frame" or "circumferential frame member" should be construed to mean "a frame member at or near the periphery of the window that does not require a full circumference member."

Magna argues that "a circumferential frame" or "circumferential frame member" should be construed to be mean "outer peripheral frame that forms a complete or substantially complete perimeter around the glazing panes (sliding pane along with one or more fixed panes)."

According to Federal Circuit precedent, the claim language must be construed in light of the specification and, if in evidence, the prosecution history. Both parties direct the Court to two relevant passages in the specification of the '769 Patent as relevant to interpreting "circumferential frame" and "circumferential frame member."

First, the parties direct the Court to the "Background" section of the patent, which discusses the circumferential frame:

> Motor vehicle window assemblies having one or more laterally sliding panes, that is, panes which slide substantially horizontally in the vertical plane of the pane, may be either manually operated or operated by electric motor. Such window assemblies are used, for example, as rear slider windows for pickup truck cabs, typically having **a circumferential (that is, outer peripheral) frame in which are mounted a sliding pane along with one or more fixed panes**. The frame may be structural or semi-structural in that it integrates the sliding pane and one or more fixed-position panes as a self-contained preassembled module suitable for shipping and handling during installation into a motor vehicle. ('769 pat. col. 1 ll. 19-31 (emphasis added.))

Second, the parties direct the Court to a relevant passage in the "Detailed Description of Certain Preferred Embodiments" section of the patent. This section states as follows:

> The window construction schematically illustrated in FIG. 1 is a rear slider in a pickup truck cab, having a center mounted slider pane 12 positioned (in its closed position) between right side and left side fixed-position panes 14, 16, respectively. The slider pane and fixed position panes are mounted in a circumferential frame 18 having substantially vertical right and left portions 20, 22, respectively, interconnected by substantially horizontal upper and lower frame portions 24, 26, respectively. In addition, optional left and right mullions, i.e., vertical frame portions 28, 29 are positioned at the junction of the slider pane (again, in its closed position) with right side fixed position pane 14 and left side fixed position pane 16, respectively. The window construction is seated in a window opening 30 defined by vehicle body 31 at the rear of the passenger compartment. Thus, the window construction is oriented in a generally vertical plane. Suitable positioning means may be employed, such as a so-called halo molding, to facilitate the proper positioning of the window construction in the window opening 30. **In this regard, the frame 18 is said to be circumferential in the sense that it forms a complete or substantially complete perimeter around the glazing panes**. Preferably the frame integrates the window construction, such that the window construction is structural or semi-structural in the sense that it is sufficiently self-supporting as a preassembled self-contained module, to withstand stresses placed upon it during shipping, handling and installation into the motor vehicle window opening.

> **In accordance with current design preferences, the circumferential frame preferably includes at least one unitary full-circumference member extending all the way around the perimeter.** Such full-circumference member can be formed by injection molding in-place around the fixed-position panes employing suitable plastics. . . . (*Id.* at Col. 5-6 ll. 66-33 (emphasis added.))

There are two main differences between Dura's proposed construction and Magna's proposed construction. First, Dura argues in its reply brief that the Court's construction should not include the language that the circumferential frame forms "a complete or substantially complete perimeter around the glazing panes", even though Dura essentially agreed with this construction in its opening brief. In support of its argument, Dura argues that the quoted language should not be used to confirm the meaning of "circumferential" because the

specification only used the language to define "circumferential" in a particular preferred embodiment having "optional left and right mullions."

More specifically, Dura's argument is that the phrase "In this regard" in the following passage refers only to one particular "optional" configuration having the left and right mullions:

> The window construction schematically illustrated in FIG. 1 is a rear slider in a pickup truck cab, having a center mounted slider pane 12 positioned (in its closed position) between right side and left side fixed-position panes 14, 16, respectively. The slider pane and fixed position panes are mounted in a circumferential frame 18 having substantially vertical right and left portions 20, 22, respectively, interconnected by substantially horizontal upper and lower frame portions 24, 26, respectively. In addition, optional left and right mullions, i.e., vertical frame portions 28, 29 are positioned at the junction of the slider pane (again, in its closed position) with right side fixed position pane 14 and left side fixed position pane 16, respectively. The window construction is seated in a window opening 30 defined by vehicle body 31 at the rear of the passenger compartment. Thus, the window construction is oriented in a generally vertical plane. Suitable positioning means may be employed, such as a so-called halo molding, to facilitate the proper positioning of the window construction in the window opening 30. **In this regard**, the frame 18 is said to be circumferential in the sense that it forms a complete or substantially complete perimeter around the glazing panes.

('769 pat. col. 5-6 ll. 66-20 (emphasis added.))

The Court disagrees that this passage supports Dura's argument. The language "In this regard" more logically refers directly back to the previous sentence discussing generally suitable positioning means to facilitate proper positioning of the windows in the window opening 30 and does not limit the definition of "circumferential frame" to only the one "optional" configuration having the left and right mullions. The section of the written description above beginning with "In this regard" is referring generally to the circumferential frame, not to how the circumferential frame would be constructed in only an optional embodiment with left and right mullions. Dura agreed at oral argument that the halo molding being referred to in the sentence preceding the "In this regard" language means the molding that would go around the outside of the window

construction to position the window construction in opening 30.  (July 22, 2010 Transcript at p. 11.)   This section of the specification clearly articulates what was meant by the use of "circumferential" in all embodiments.   This definitional phrase comports with the plain and ordinary meaning of the term "circumferential" as used in the context of this patented invention – that is, that the frame at least substantially goes around the circumference of the windows.   The parties agree that exactly how much of the perimeter must be completed to be "substantially complete" is a question of fact for the jury.  (July 22, 2010 Transcript at p. 26.)  Accordingly, the Court agrees with Magna on this issue.

Second, the parties disagree as to whether the Court's construction for "circumferential frame" should include the language that the frame is "outer peripheral" with respect to the windows or the alternative language "a frame at or near the periphery of the window".  Magna argues that the construction should contain the language "outer peripheral," while Dura argues that the language would be unclear to a lay jury and proposes the alternative "a frame at or near the periphery of the window. . . ."  This particular claim construction nuance was not extensively briefed by the parties.  At oral argument, Magna in passing took issue with the "at or near the periphery of the window" language.  Magna appeared to argue that the frame needs to be at the periphery of the window, not just near the periphery of the window, because this is the only embodiment that will work in the claimed invention.  The Court agrees with Dura on this issue.  The Court finds that Dura's proposed language would be easier for a jury and parties to understand.  The Court finds that a jury may not understand the meaning of "outer peripheral."

Accordingly, the Court construes the term "circumferential frame" as follows: A "circumferential frame" means "a frame that forms a complete or substantially complete perimeter around the glazing panes (for example, a sliding pane and one or more fixed panes)

and that is located at or near the periphery of the glazing panes." At oral argument, there was some disagreement between the parties as to the exact meaning of "glazing panes" as that term is used in the specification of the patent. Magna had included the language "(a sliding pane and one or more fixed panes)" in its proposed construction to provide the jury with a better understanding of what glazing panes meant in this field. At oral argument, Dura took issue with this explanation and argued that "glazing panes" meant simply windows, but also agreed that the claim had to have at least one sliding window. For purposes of this case, however, the dispute is not "material" in the sense that the accused products have glazing panes under either party's proposed construction of "glazing panes." The Court does not intend the parenthetical explanation of glazing panes to have collateral estoppel effect in future cases. This construction is just intended to give an explanation for the jury in this particular case as there is not a dispute between the parties that the accused products have glazing panes. The Court notes that the language "a sliding pane along with one or more fixed panes" is used in the "Background" section of the '769 patent and thus the scope of the "glazing panes" includes at least this example.

The parties also request that the Court construe the term "circumferential frame member" in Claims 1, 4, 24, and 26. In its opening brief, Dura argued that "circumferential frame member" should be construed exactly the same as "circumferential frame." In its reply brief, Dura changed its argument and argued that the terms should not be construed to have the same meaning. Dura proposed the following construction in its reply brief: "a frame member at or near the periphery of the window that does not require a full circumference member." It also provides a construction or dictionary definition for "member": "a distinct part of a whole." Dura argues that the "circumferential frame member" is part of the overall circumferential frame. (Dura's reply br. at p. 6.) At oral argument, Dura stated "a circumferential frame member is part

of a whole frame, so a member should be construed as part of a circumferential frame that this Court previously construed." (July 22, 2010 Transcript at p. 13.) Dura also stated that "a frame member is one or more pieces of a frame." (*Id*. at p. 14.) Magna disagrees that the "circumferential frame member" should have a different meaning than "circumferential frame." However, in the event that the Court finds that this term needs to be construed, Magna provides an alternative construction for circumferential frame member, specifically "outer peripheral frame member that forms a complete or substantially complete perimeter around the glazing panes (sliding pane along with one or more fixed panes)."

The Court notes that the '761 patent appears to use the term "circumferential frame member" and "circumferential frame" somewhat interchangeably. For example, independent Claims 16 and 21 use the term "a circumferential frame." Dependent Claim 18, which depends directly from Claim 16, refers back to the circumferential frame of Claim 16 as "the frame member." Dependent Claims 23 and 24, which depend directly from Claim 21, refer back to the circumferential frame of Claim 21 as "the circumferential frame member."

The '761 patent generally uses the term "circumferential frame member" to simply describe a frame structure that generally surrounds the windows. The patent most often uses the term "circumferential frame member" to describe the fact that the "circumferential frame member" is a component of the "frame means" in the independent claims. Dura has not explained why any difference in its proposed constructions for "circumferential frame member" and "circumferential frame" is material to the ultimate question of infringement or validity in this particular case. The Court adopts the same corresponding construction for "circumferential frame member" as "circumferential frame": A "circumferential frame member" means "a frame member that forms a complete or substantially complete perimeter around the glazing panes (for

example, a sliding window pane along with one or more fixed window panes) and that is located at or near the periphery of the glazing panes."

## B.    "CURVED INTERNAL PASSAGEWAY" in CLAIMS 1, 4, 14, 16, 21, AND 26 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 3. "curved internal passageway" ('769 Patent – Claims 1, 4, 14, 16, 21, 26) | an internal passageway that is curved. | interior passageway that is serpentine in shape (S-shaped) to guide a cable | an internal passageway that is curved. |

The parties request that the Court construe the term "curved internal passageway" in Claims 1, 4, 14, 16, 21, and 26 of the '769 patent.

By way of example, Claim 1 reads as follows, with the relevant language highlighted:

1.  A motor vehicle window construction in a motor vehicle, comprising, in combination:

    frame means mounted in a window recess in a vehicle body comprising a circumferential frame member with a first cable directional block integral with a lower horizontal portion of the frame member;

    a slider subassembly comprising a transparent pane and being slidably mounted in the frame means for sliding laterally back and forth between a full open position and a closed position in a laterally extending slider travel channel in the lower horizontal portion of the frame member; and

    a pull-pull cable drive subassembly for moving the slider subassembly laterally back and forth between its full open and closed positions, the pull-pull cable drive subassembly comprising:

    drive apparatus mounted to the vehicle body remote from the circumferential frame member, comprising a drive motor having an output member and a drive drum operatively engaging the output member for rotation upon actuation of the drive motor; and

    drive cable attached to the slider subassembly and wrapped around the drive drum for pulling the slider subassembly substantially laterally in a first direction toward its full open position upon rotation of the drive drum in a first rotational direction,

and for pulling the slider subassembly substantially laterally in a second direction toward its closed position upon rotation of the drive drum in an opposite rotational direction, the slider subassembly and drive cable together forming a closed loop from the drive drum, with a first drive cable segment extending laterally from the slider subassembly toward a left side of the frame member and a second drive cable segment extending laterally from the slider subassembly toward a right side of the frame member;

wherein a section of the first drive cable segment extends in a first cable channel in the substantially horizontal lower portion of the frame member, and the first cable directional block forms **a curved internal passageway** guiding the drive cable from the first cable channel to a first entry point. (Emphasis added.)

Figures 1 and 5 of the '769 patent illustrate one embodiment of the invention. Figures 1 and 5, which are reproduced below, show "cable directional blocks" 50 and 54 having "serpentine" passageways:



Fig. 1



**Fig. 5**

The purpose of a cable directional block is to direct the drive cable into the cable entry point of the lower frame member where it will eventually connect to a slider subassembly to move the sliding glass pane. Figure 5 shows an example of a curved internal passageway. The patent's written description calls the specific embodiment depicted in the drawings a "serpentine passageway 60." Specifically, the specification describes Figure 5 as follows:

> A serpentine passageway 60 extends from socket 58, guiding drive cable 42 into proper alignment with a cable channel 62 (see FIG. 3) extending laterally within lower frame portion 26. A corresponding cable channel extends to the right of slider pane 12 to cable directional block 54.

('769 Pat. col. 7 ll. 43-48.)

In denying a previous summary judgment motion filed by Magna, the Court previously interpreted "curved internal passageway" as "an internal passageway that is curved." The Court's Opinion and Order states in a footnote that Magna argued that "curved internal passageway" should be interpreted to mean "serpentine." While the Court noted that the '769 patent describes the passageway as "serpentine" within the "Preferred Embodiments" section, the Court held that "this distinction to be one which does not make a difference in the outcome of the motion, and thus the Court declines to resolve this dispute between the parties." (Opinion & Order p. 11 n.1, Doc. No. 347.)

Magna argues that in the context of the '769 patent, the term "curved" means "serpentine" or "S-shaped." Magna argues that it is not reading limitations into the claims, but merely interpreting the meaning of the term "curved" in light of the specification of the '769 patent, its prosecution history, and the prior art of record. Magna further argues that if the Court interprets the claim language to mean "serpentine (S-shaped)," such an interpretation may help preserve validity of the claims. Magna quotes *ACR Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed. Cir. 1984) in support of its position: "Further, claims should be construed, if possible, as to sustain their validity."

The Federal Circuit frequently refers to twin axioms regarding the role of the specification in constructing patent claims. "On one hand, claims must be read in view of the specification in which they are a part. On the other hand, it is improper to read a limitation from the specification into the claims." *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 904 (Fed. Cir. 2004). "The problem is to interpret claims in view of the specification without unnecessarily importing limitations from the specification into the claims." *Id.* at 905 (quotations and citations omitted). In *Phillips v. AWH Corp*., an *en banc* Federal Circuit recognized that applying these twin axioms is difficult in practice. The Federal Circuit advised that district courts should stay focused on "understanding how a person of ordinary skill in the art would understand the claim terms." The Federal Circuit noted that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments [contained in the written description]." *Phillips v. AWH Corp*., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). The Federal Circuit noted that the embodiments disclosed in the written description and drawings are typically exemplary embodiments. However, there will be situations where the patentee makes clear that the embodiments disclosed in the written

description are to be strictly coextensive with the claims. *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

In construing a claim term, the Court starts with the words of the claims. As the Court previously stated in denying Magna's motion for summary judgment, the claim language "curved internal passageway" is clear on its face. "Curved internal passageway" means "an internal passageway that is curved."

Turning to the written description of the '769 patent, Magna has not pointed to any sections of the specification which indicate that the discussion in the written description about a "serpentine passageway" as shown in Figure 5 at reference 60 is anything other than an exemplary embodiment. The word "serpentine" occurs only two times in the '769 patent. Both of the occurrences are in the section entitled "Detailed Description of Certain Preferred Embodiments."

While the "Preferred Embodiment" section of the '769 patent describes and shows a specific embodiment in Figure 5 and describes that embodiment as "serpentine," Federal Circuit precedent teaches that although the specification often describes very specific embodiments, it is improper to confine the scope of the claims to the exemplary embodiments unless it is clear that the broader claim language is coextensive with the specific examples described in the other parts of the specification. *Phillips*, 415 F.3d at 1323. Specifically, the "preferred embodiments" section of the '769 patent states:

> **A serpentine passageway** 60 extends from socket 58, guiding drive cable 42 into proper alignment with a cable channel 62 (see FIG. 3) extending laterally within lower frame portion 26.

('769 Pat. col. 7 ll. 43-48.) However, this language, which describes the drawing of Figure 5, is only describing an exemplary embodiment. The language in the specification is not definitional

in nature so as to limit the language "curved internal passageway" to "serpentine in shape (S-shaped)" as proposed by Magna.  Nor does this language make it clear that "curved internal passageway" and "serpentine" are coextensive in scope.  The above language appears to only be describing a preferred embodiment of the invention.

Turning to the prosecution history, the Court also disagrees with Magna that the current state of the prosecution history shows that "curved internal passageway" should be construed to mean "serpentine in shape (S-shaped)." There are currently two separate sets of prosecution histories relevant for the '769 patent: (1) the original prosecution history of the application that resulted in the '769 patent; and (2) the prosecution history of the reexamination proceeding of the '769 patent that is currently ongoing.  In recent responses to an office action in the pending reexamination proceeding the '769 patent, Dura has made clear in the prosecution history that the cable directional blocks having a curved internal passageway can include non-serpentine (S-shaped) embodiments, specifically "pulleys."   Specifically, in responding to an office action, Dura stated: "While the required cable directional block(s) <u>can include pulleys</u>, Kitsukawa's conduit-less system does not provide at least of the advantages of the illustrated embodiments of the '769 patent, inhibiting water in the sliding pane's travel channel from wicking through the conduit and damaging the cable and motor."  (Dura June 22, 2010 Resp. to Office Action p. 18, Doc. No. 418-2 (emphasis added.))   With this statement, Dura is making clear in the reexamination proceeding that pulleys can fall within the scope of a cable directional block with a curved internal passageway.

The United States Patent Office is examining the patent with the understanding that "curved internal passageway" is not limited to "serpentine in shape (S-shaped)." For example, in rejecting the '769 patent during the reexamination proceeding, the examiner in the patent office

stated that "Ujihara et al. teaches a cable directional block 11 integral with the frame, having a curved internal passageway guiding a drive cable 9 from a cable channel seen in Figure 1 to a first entry point." (April 22, 2010 Office Action p. 7.) Ujihara shows a semi-circular guide member 11 and a guide pulley 10. Figure 1 below of the Ujihara patent shows the guide member 11 and the guide pulley 10.



**FIG.1**

Thus, the examiner is conducting the '769 patent reexamination with the understanding that the "curved internal passageway" covers more than "serpentine in shape (S-shaped)."

In fact, Magna admits in its response brief that its proposed "serpentine in shape (S-shaped)" construction is not being used in the reexamination proceeding: "This broader definition is being used in the reexamination of the '769 patent. Using the broader construction, the new Examiner is now challenging the validity of the '769 patent based on Ujihara." (Magna resp. br. p. 8, Doc. No. 411.) Thus, Magna has admitted that in the current reexamination prosecution proceeding that the examiner and Dura are both in agreement that "curved internal passageway" is not limited to "serpentine (S-shaped)."

The Court also disagrees with Magna that the original prosecution history (i.e., the prosecution history that occurred before the reexamination proceeding) makes clear that "curved internal passageway" is be construed to mean "serpentine in shape (S-shaped)." In order to limit clear claim language to a more narrow definition, generally, the inventor must make a "clear and unmistakable disavowal" of broader claim scope or otherwise teach how a particular term should be interpreted. *Computer Docking Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *see also Phillips v. AWH Corp.*, 415 F.3d at 1317. The Court has reviewed the original portions of the prosecution history of the '769 patent provided by Magna. Dura did not make a "clear disavowal" of curved internal passageway to "serpentine in shape (S-shaped)" or otherwise correlate curved "internal passageway" to be coextensive in scope as "serpentine in shape (S-shaped)" during the original prosecution of the '769 patent.

The Court also disagrees with Magna's argument that the Court should adopt its proposed construction for "curved internal passageway" in order to preserve the validity of the affected claims. Magna argues that the claims of the '769 patent will likely be held invalid unless the Court adopts Magna's proposed narrow construction. While the Federal Circuit has acknowledged the claim construction maxim that claims should be construed to preserve their validity, the Federal Circuit limited application of the maxim in *Phillips* to cases in which the "court concludes, after applying all the available tools of claim construction, that claim is still ambiguous." *Phillips*, 415 F.3d at 1327 (quotations omitted). In such cases, the district court is to determine whether it is reasonable to infer that the U.S. Patent Office would not have issued an invalid patent and that ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity. *Id*. *Phillips* states that a validity analysis is not

a regular component of claim construction. *Id.* The Court finds that the claim language "curved internal passageway" is not limited to "serpentine in shape (S-shaped)"

Finally, Magna argues that the Court's construction of "curved internal passageway" or the related claim term "cable directional blocks" should exclude pulleys. The Court will address this argument in the next section of this Opinion and Order, which discusses the disputed claim term "cable directional block."

Accordingly, the Court construes "curved internal passageway" to mean "an internal passageway that is curved."

### C.    "CABLE DIRECTIONAL BLOCK" IN CLAIMS 1, 4, 14, 26, and 27 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 7. "cable directional block" ('769 Patent – Claims 1, 4, 14, 26, 27) | Plaintiffs do not believe the phrase "cable directional block" requires construction by the Court.<br><br>However, should the Court determine that the term "block" requires construction, Plaintiffs suggest the following, consistent with the plain and ordinary meaning: "block" means "a piece used as a construction member or support" or "the housing holding the sheaves or pulleys over which a rope or chain passes, as in a lifting tackle. The term commonly includes sheaves. A block has a hook eye or strap for attaching it to an object and it can be used for changing the direction of a running rope." | guide box that directs movement of a cable | a block that aligns the cable or directs the cable in a particular direction. |

Magna requests that the Court construe the term "cable directional block" in Claims 1, 4, 14, 26, and 27 of the '769 patent.

As an example of the disputed claim language, Claim 1 is reproduced below:

1. A motor vehicle window construction in a motor vehicle, comprising, in combination:

frame means mounted in a window recess in a vehicle body comprising a circumferential frame member with **a first cable directional block** integral with a lower horizontal portion of the frame member;

a slider subassembly comprising a transparent pane and being slidably mounted in the frame means for sliding laterally back and forth between a full open position and a closed position in a laterally extending slider travel channel in the lower horizontal portion of the frame member; and

a pull-pull cable drive subassembly for moving the slider subassembly laterally back and forth between its full open and closed positions, the pull-pull cable drive subassembly comprising:

drive apparatus mounted to the vehicle body remote from the circumferential frame member, comprising a drive motor having an output member and a drive drum operatively engaging the output member for rotation upon actuation of the drive motor; and

drive cable attached to the slider subassembly and wrapped around the drive drum for pulling the slider subassembly substantially laterally in a first direction toward its full open position upon rotation of the drive drum in a first rotational direction, and for pulling the slider subassembly substantially laterally in a second direction toward its closed position upon rotation of the drive drum in an opposite rotational direction, the slider subassembly and drive cable together forming a closed loop from the drive drum, with a first drive cable segment extending laterally from the slider subassembly toward a left side of the frame member and a second drive cable segment extending laterally from the slider subassembly toward a right side of the frame member;

wherein a section of the first drive cable segment extends in a first cable channel in the substantially horizontal lower portion of the frame member, and **the first cable directional block** forms a curved internal passageway guiding the drive cable from the first cable channel to a first entry point. (Emphasis added.)

The Court notes that the claim language states that the first cable directional block forms a curved internal passageway guiding the drive cable from the cable channel to a first entry point

in the lower frame member. The term "cable directional block" is thus associated with the part of the claim term "curved internal passageway," which the Court construed in the previous section of this Opinion and Order.

Figures 1 and 5 of the '769 patent, which are reproduced below, illustrate an exemplary embodiment of the cable directional block. Reference numbers 50 and 54 denote the cable directional blocks in Figures 1 and 5. Reference number 60 denotes the "curved internal passageway" that the cable directional block forms.



Fig. 1



Fig. 5

In its opening brief, Dura argued that the term "cable directional block" is clear and needs no construction: "The term 'cable directional block' would be clear and unambiguous to one of ordinary skill in the art having read the '769 patent specification and claims, and does not require any construction by the Court. . . ."

In its response brief, Magna argues that the term "cable directional block" should be construed to mean a "guide box that directs movement of a cable." Magna also argues that a "cable directional block" should not include pulleys. Magna argues that its proposed construction is supported by Figures 1 and 5 and column 7 lines 32-53 of the '769 patent specification and also the prosecution history. Column 7 lines 32-53 state:

> As best seen in the enlarged illustrations of FIGS. 5 and 6, the embodiment of FIG. 1 comprises a **cable directional block** 50 which receives conduit end 52 of left side drive cable segment 42. Similarly, cable directional block 54 receives conduit end 56 of right side drive cable segment 44. The directional blocks can be affixed to the lower frame portion 26, optionally being unitary therewith, or can be affixed to the adjacent fixed-position panes. Since the left and right side cable directional blocks are substantially mirror images of each other, only left side block 50 will be described here in detail. **Directional block 50** provides a socket 58 to receive and releasably hold conduit end 52 in position at the frame. A serpentine passageway 60 extends from socket 58, guiding drive cable 42 into proper alignment with a cable channel 62 (see FIG. 3) extending laterally within lower frame portion 26. A corresponding cable channel extends to the right of slider pane 12 to cable directional block 54. The cable directional blocks can be formed, for example, of molded plastic. For ease of manufacturing, as best seen in FIG. 6, the cable directional blocks can be made of a first piece 64 having serpentine passageway 60 formed in its surface 65, with a second piece 66 bonded or otherwise secured to surface 65. (Emphasis added.)

Magna points out that the term "cable directional block" was added during prosecution to distinguish the invention from the prior art which disclosed pulleys. As to why its proposed construction contains the word "box," Magna directs the Court to Exhibit M of its response, which is a summary of a telephone call between Dura's attorney and the patent examiner during the prosecution of the '769 patent. The patent Examiner Interview Summary Record states:

"Discussed the guide boxes aligning the cable as discussed in the proposed claim amendment."
(Magna resp. br. Ex. M, Doc. No. 411-15.)

There are two issues for this claim term. First, should the claim language "cable directional block" along with its related claim limitation "curved internal passageway" be construed to exclude "pulleys"? Second, does the term "cable directional block" need to be construed and, if so, what should be its construction?

The Court will first address whether the terms "cable directional block" and "curved internal passageway" should be construed to exclude pulleys. Generally, pulleys are grooved or flat wheels used to change the direction of the rope or cable that runs on the pulleys. Magna argues that the prosecution history of the '769 patent supports its position that the claim language should be construed to exclude pulleys. Contrary to Magna's argument, in the recent prosecution history in the reexamination proceeding, Dura has made clear that the claimed cable directional block can include "pulleys." Specifically, the Examiner in the reexamination proceeding rejected Claims 1-14, 16, 20, 21, and 24-26 as being invalid for obvious under 35 U.S.C. § 103(a) over Kitsukawa et al. (JP 1-219280) in view of Ujihara (U.S. Patent No. 4,970,911) and Heuchert (U.S. 4,835,937). In responding to the office action, Dura stated: "While the required cable directional block(s) can include pulleys, Kitsukawa's conduit-less system does not provide at least one of the advantages of the illustrated embodiments of the '769 patent, inhibiting water in the sliding pane's travel channel from wicking through the conduit and damaging the cable and motor." (Dura June 22, 2010 Resp. to Office Action p. 18, Doc. No. 418-2 (emphasis added.)) With this statement, Dura is making clear in the reexamination proceeding that pulleys can fall within the scope of a cable directional block with a curved internal passageway.

The Federal Circuit has held that statements made during a reexamination proceeding are relevant prosecution history when construing claim terms. *See EI. Du Pont de Nemours & Co. v. Phillips Petroleum Co*., 849 F.2d 1430, 1439 (Fed. Cir. 1988).

At oral argument, on July 22, 2010, the Court's technical adviser brought the above statement in the reexamination proceeding to the parties' attention. In its August 9, 2010 Supplemental Claim Construction Brief, Magna argued that the statement is self-serving and should be given little weight while there is a pending litigation.

From the record in the reexamination proceeding, the Court is not convinced that Dura's statement in the examination proceeding was self-serving in the sense of being directed at affecting this litigation. In fact, it was the Court's technical adviser that brought the statement to the parties' attention at oral argument. Moreover, the statement in the prosecution history was relevant to the office action received in the reexamination proceeding and does not appear to be a blatant attempt to affect these claim construction proceedings. In the reexamination proceeding, the examiner had cited the Kitsukawa Japanese patent application as prior art against Dura. The Kitsukawa patent application appears to show the use of pulleys 31, 32 to change the direction of the cable. Figure 6 of Kitsukawa showing pulley type device 31 is reproduced below:



Figure 6

In response to the examiner's rejection, Dura argues that while the claimed cable directional block forming a curved internal passageway includes pulleys, the Japanese patent application did not have other features of its invention. Specifically, in responding to the office action, Dura stated: "While the required cable directional block(s) can include pulleys, Kitsukawa's conduit-less system does not provide at least one of the advantages of the illustrated embodiments of the '769 patent, inhibiting water in the sliding pane's travel channel from wicking through the conduit and damaging the cable and motor." (Dura June 22, 2010 Resp. to Office Action p. 18, Doc. No. 418-2 (emphasis added.))

The use of the term "block" is also consistent when speaking of pulleys. The Federal Circuit has held that dictionaries and treatises, especially technical dictionaries, "can be useful in claim construction" "when considered in context of the intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d at 1318 and 1319. Dictionaries generally define the term "block" when speaking of engineering as a pulley or system of pulleys set in a casing. One dictionary gives the following definition for "block": "a part enclosing one or more freely rotating, grooved pulleys, about which ropes or chains pass to form a hoisting or hauling tackle." Random House

Webster's College Dictionary p. 144 (2000). Dura provides the following definition of "block" from the Dictionary of Mechanical Engineering (1967): "The housing holding the sheaves or pulleys over which a rope or chain passes, as in a lifting tackle. The term commonly includes the sheaves. A block has a hook eye or strap for attaching it to an object and it can be used for changing the direction of a running rope." In fact, most lay people have heard of the term "block and tackle," when speaking of pulleys. An example of a block when speaking of pulleys is shown below.



**Block**

When two or more blocks are used with a rope or chain for hoisting or hauling, the combination is known as a tackle. See, e.g., Random House Webster's College Dictionary p. 1332 (2000). An example of a block and tackle is shown below:



The Court holds that it cannot construe "cable directional block" to exclude pulleys based on the evidence and arguments provided.

The Court will now address whether the term "cable directional block" needs to be construed and, if so, what should be its construction. Dura argues that "cable directional block" does not need to be construed by the Court, but provides a definition of "block" from the Dictionary of Mechanical Engineering (1967): "the housing holding the sheaves or pulleys over which a rope of chain passes, as in a lifting tackle. The term commonly includes sheaves. A block has a hook eye or strap for attaching it to an object and it can be used for changing the direction of a running rope." Magna argues that the term should be construed to mean: "Guide box that directs movement of a cable." Magna's proposed construction of "guide box" is taken from a summary of an examiner interview written by the examiner. The examiner interview form has a section that states: "Description of the general nature of what was agreed to if an agreement was reached, or any other comments." In the blank space available, the examiner wrote: "Discussed the guide boxes aligning the cable as discussed in the proposed claimed [sic] amendment." (June 2, 1997 Examiner Interview Summary, Magna Resp. Br. Ex. M.)

The Court notes that the claim language specifies that the first cable directional block forms a curved internal passageway guiding the drive cable from the cable channel to a first entry point in the lower frame member. Taken as a whole, this language is clear in describing the function of the cable directional block, which is to align or direct the cable into the lower horizontal frame member. The construction proposed by Magna is consistent with the function. However, the Court believes that replacing the term "block" with "guide box" does not make the claimed invention any more clear for the jury and Magna has not shown that the term "guide box" is co-extensive in scope with "block."

The Court construes this "cable directional block" to mean "a block that aligns a cable or directs a cable in a particular direction." This construction stays true to the claim language and keeps the term "block" as requested by Dura while providing a restatement of the function of the cable directional block as requested by Magna.

### D.     "INTEGRAL" IN CLAIMS 1 AND 4 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 8. "integral" ('769 Patent – Claims 1, 4) | Modified proposed construction at oral argument: "one piece or more than one piece, connected." | Modified proposed construction at oral argument: "one piece or fixed." | The cable directional block can be formed as one piece with the horizontal frame portion or the cable directional block and the lower horizontal frame portion can be two or more pieces that are affixed together. |

Magna requests that the Court construe the term "integral" in Claims 1 and 4 of the '769 patent.

The pertinent portions of Claims 1 and 4 state:

> 1. A motor vehicle window construction in a motor vehicle, comprising, in combination:
>
> frame means mounted in a window recess in a vehicle body comprising a circumferential frame member with a first cable directional block **integral** with a lower horizontal portion of the frame member; . . . . (Emphasis added.)
>
>          *      *      *
>
> 4. A multi-pane window construction in a motor vehicle, the window construction comprising, in combination:
>
> frame means mounted in a window opening of a motor vehicle body, comprising a circumferential frame member having substantially vertical right and left portions interconnected by substantially horizontal upper and lower portions, with a first cable directional

block **integral** with the lower horizontal portion of the frame member; . . . . (Emphasis added.)

Figure 1 of the '769 patent, which is reproduced below, shows an embodiment having cable directional blocks 50 and 54 in an "integral" relationship with the lower frame portion 26.



**Fig. 1**

Dura argues that the claim term "integral" does not require construction because the term would be clear and unambiguous to one of ordinary skill in the art. However, neither the jurors, the attorneys in this case, nor this Court are persons of ordinary skill in the art. Accordingly, the Court agrees with Magna that the claim term "integral" needs to be construed because a jury may not readily understand the term as used.

Neither party briefed its position extensively on this term.

On the day of the Court's claim construction hearing, the Court instructed the parties to have a conference before the oral argument began to see if they could come to an agreement on the construction for this term. Although the parties did not come to an agreement, they did narrow the dispute for the Court. At oral argument, Dura took the position that "integral" should

be construed to mean "one-piece or more than one piece, connected", which when considered along with the surrounding claim language and the written description of the patent, means that the cable directional block is either formed as one piece with the lower horizontal portion of the frame or is connected to the frame. At oral argument, Magna modified its proposed construction to "one piece or fixed." (July 22, 2010 Transcript at 65.) Magna explained its position at the oral argument as follows: "Fixed . . . suggests that it's all together in one unit; . . . It's our position, again, that these blocks as described in their specification are locked into place or fixed into place. So that's . . . what they meant by integral. They meant it's part of the lower rail. That's what they are trying to say." (*Id*. at 67.)

The term "integral" is not used anywhere else in the '769 patent, except in the disputed claim language. However, the "Detailed Description of Certain Preferred Embodiments" section of the '769 patent describes the relationship between the "cable directional block" and the "lower frame member 26" as follows:

> The directional blocks can be affixed to the lower frame portion 26, optionally being unitary therewith, or can be affixed to the adjacent fixed-position panes.

('769 pat. col. 7 lines 36-39, emphasis added.) The specification also describes what is meant by unitary:

> Such mating studs can be formed during initial molding of the frame as unitary nubs or projections from the surface of the frame. ('769 pat. col. 9 ll. 39-41.)

> The circumferential frame member of such embodiments can be formed of molded plastic as a single unitary item, with open and/or closed cross-sectional configuration channels formed therein. ('769 pat. col. 3 ll. 8-12.)

The prosecution history sheds light on the meaning of "integral." In the "Remarks" section of the July 12, 1997 Amendment in Response to Office Action, under the heading "Examiner Interview," Dura stated: "An alternative version of amended Claim was presented

and discussed briefly, wherein the cable directional block is defined as <u>contacting</u> a lower horizontal portion of the frame member, rather than necessarily being integral therewith." (July 12, 1997 Amendment in Response to Office Action at pg. 9 (emphasis in original.)) Based on this statement, the term "integral" was not intended to mean merely "contacting."

The parties' proposed constructions are almost identical and the Court sees very little difference in their proposed constructions. The parties admitted as much at oral argument. (July 22, 2010 Transcript p. at 66.) The Court construes the term "integral" to mean that "the cable directional block can be formed as one piece with the horizontal frame portion or the cable directional block and the lower horizontal frame portion can be two or more pieces that are affixed together." This construction is essentially Dura's proposed construction, while also incorporating Magna's position.

### E. "TRANSPARENT PANE" IN CLAIMS 1, 4, 16, 21, AND 26 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 9. "transparent pane" ('769 Patent – Claims 1, 4, 16, 21, 26) | Modified proposed construction at oral argument:<br><br>"Having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen." | Modified proposed construction at oral argument:<br><br>"having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen, e.g., clear water." | "Having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen." |

Magna requests that the Court construe the term "transparent pane" in Claims 1, 4, 16, 21, and 26 of the '769 patent.

As an example of the use of the disputed claim language, the relevant portion of Claim 1 is reproduced below:

> 1. A motor vehicle window construction in a motor vehicle, comprising, in combination:
>
>     \*       \*       \*
>
> a slider subassembly comprising **a transparent pane** and being slidably mounted in the frame means for sliding laterally back and forth between a full open position and a closed position in a laterally extending slider travel channel in the lower horizontal portion of the frame member; . . . .  (Emphasis added.)

At the claim construction hearing, the parties narrowed the issue for the Court to whether the following proposed construction for "transparent pane" should include the example "e.g., clear water" in the following proposed construction: "having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen, e.g., clear water."  At oral argument, Dura took the position that the example "e.g., clear water" was not needed.  Magna argued that the example would make the construction more clear and also argued that the example of "clear water" is part of the dictionary definition from which Dura derived the proposed construction.  (July 22, 2010 Transcript at pgs. 67-69.)

The specification provides no guidance as to the meaning of "transparent" in the context of the '769 Patent and neither party cites to other portions of the specification or prosecution history.

Based on agreement between the parties, the Court construes "transparent pane" to mean "having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen."  The Court finds that the example "e.g., clear water" is not needed and is not an example in the context of automobile windows.  The jury will not need

the example to understand the term "transparent" in the context of the automobile windows, which is readily understandable to laypeople.

## F. "RETROFITTING KIT" AND "FLANGE" IN CLAIM 16 OF THE '769 PATENT

The parties had requested that the Court construe the term "retrofitting" or "retrofitting kit", and "flange" in Claim 16 of the '769 patent.

At the claim construction hearing, the Court instructed the parties to have a conference before the hearing began to see if Claim 16 was truly at issue in this lawsuit. After having a conference, the parties instructed the Court that Claim 16 is no longer at issue and that the Court does not need to construe "retrofitting kit" and "flange." (July 22, 2010 Transcript at pgs. 69-70.)

## G. "EACH FORMING A CURVED INTERNAL PASSAGEWAY" IN CLAIM 21 OF THE '769 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 12. "each conduit forming a curved internal passageway" ('769 Patent – Claim 21) | Plaintiffs do not believe the phrase "each conduit forming a curved internal passageway" requires construction by the Court.<br><br>Plaintiffs also believe that Claim 21 is clear and unambiguous and, thus is not indefinite as argued by the Defendant. | Claim term is not capable of construction in the context of Claim 21 as it relates to the conduit attachment brackets, which do not have any curved internal passageways, as that term has been previously construed. Thus, this claim term is indefinite and renders Claim 21 invalid. | This claim term cannot be construed and therefore Claim 21 is indefinite. |

Magna argues that the claim language "each conduit forming a curved internal passageway" in Claim 21 of the '769 patent is indefinite pursuant to 35 U.S.C. § 112 ¶ 2 because the language is not "amenable to construction" and is "insolubly ambiguous."[2]  Magna argues that the claim limitation "each conduit forming a curved internal passageway" refers to the "conduit attachment brackets," which do not have any curved internal passageways, as that term has been previously construed.  Thus, Magna argues that this claim term is indefinite and renders Claim 21 invalid.

Dura argues that the disputed claim limitation is not indefinite, but rather so clear and unambiguous that the term does not even need to be construed.  Dura argues that the claim limitation "each conduit forming a curved internal passageway" refers to the "conduit", not the "conduit attachment brackets."  Dura argues that the conduit requires no construction.  Dura devotes only about one page of briefing to this disputed claim term.

Dura does not explain how this claim should be construed in its briefing, but simply argues that the claim is not indefinite and does not need to be construed because a person of ordinary skill in the art would understand the disputed claim term.  Dura seems to misunderstand the purpose of a *Markman* hearing, which is to translate the terse language of the claims that are understandable to a person of ordinary skill in the art into a form that would be readily understood by the jury, the parties, and the Court.

35 U.S.C. § 112 ¶ 2 states:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

---

[2] Magna also requested that the Court construe the claim limitation "each forming a curved internal passageway" in Claim 16.  However, as mentioned above, at the oral argument the parties agreed that Claim 16 is no longer being asserted in this lawsuit.

Pursuant to the 35 U.S.C. § 112 ¶ 2, a claim is invalid if it is "indefinite." 35 U.S.C. § 112 ¶ 2 requires that the claims particularly point out and distinctly claim the subject matter that the patentee regards as his invention. The matter of claim adequacy or "definiteness" under 35 U.S.C. § 112 ¶ 2 is a question of law that is reviewed de novo on appeal. *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd*., 401 F.3d 1367, 1370 (Fed. Cir. 2005). The test for whether a claim is invalid for indefiniteness is whether a person of ordinary skill in the art (PHOSITA) would understand what is claimed, or the scope or bounds of the claim, when it is read in light of the specification and prosecution history. *Id*. at 1371. If the PHOSITA would understand the bounds of the claim when read in light of the specification and prosecution history, then the claim is definite and valid. A claim is not definite if a claim is amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." *Aero Products Int'l Inc. v. Intex Recreation Corp*., 466 F.3d 1000, 1016 (Fed. Cir. 2006).

Claim 21 states:

21. A window construction installed in a window opening of a motor vehicle body, comprising:

a circumferential frame and a transparent pane slidably mounted in the frame for sliding laterally back and forth between an open position and a closed position, the transparent pane having an inside surface facing a passenger compartment of the motor vehicle body and a peripheral edge including a horizontal lower edge portion slidingly received in a laterally extending slider travel channel in a lower horizontal portion of the frame;

**a left conduit attachment bracket** mounted to the window construction to the left of, and remote from, the transparent pane and **a right conduit attachment bracket** mounted to the window construction to the right of, and remote from, the transparent pane **each conduit forming a curved internal passageway**;

an elongate bracket adhesively bonded to an inside surface of the transparent pane substantially parallel the lower horizontal edge, having a left cable fastener at a

left edge of the transparent pane and a right cable fastener at a right cable edge of the transparent pane;

drive apparatus mounted to the motor vehicle remote from the circumferential frame, comprising a drive motor having an output member and a drive drum operatively engaging the output member for rotation upon actuation of the drive motor; and

drive cable in **a conduit** operatively interconnecting the drive apparatus to the transparent pane for pull-pull powered opening and closing of the window construction by actuation of the drive motor for forward and reverse rotation of the drive drum, respectively, the first end of the conduit being attached to the left conduit attachment bracket and a second end of the conduit being attached to the right conduit attachment bracket, a first end of the drive cable being attached to the left cable fastener and a second end of the drive cable being attached to the right cable fastener, the drive cable and transparent pane together forming a closed loop from the drive drum.  (Emphasis added.)

The Court agrees with Magna and holds that the claim limitation "each conduit forming a curved internal passageway" refers to the left and right conduit attachment brackets specified in the same paragraph of Claim 21, not the actual "conduit."  From the claim language and the structure of Claim 21, the term "each" refers back to the left and right conduit attachment brackets, not the actual conduit for the drive cable.  Two facts in particular support the Court's conclusion.  First, the Court notes that the claim limitation "each conduit forming a curved internal passageway" is preceded in the same paragraph by the claim limitations "a left conduit attachment bracket" and "a right conduit attachment bracket."  The term "each" naturally refers back to the left and right conduit attachment brackets.  Second, the actual "conduit" element of the invention is introduced farther down the claim in the phrase "drive cable in a conduit."  In patent drafting, a patent attorney introduces a new element with an article identifier such as "a," "an," etc.  After introducing an element, the patent drafter refers back to the previously introduced element with an identifier such as "said," "the," or "each."  In this case the patent

drafter, by using the term "each", was referring back to the "conduit attachment brackets" language that is in the same paragraph, not to the conduit which is not yet introduced in the claim.

The Court also notes that Claim 16, which is no longer in dispute, has slightly different language: "each forming a curved internal passageway. . . ." The word "conduit", which is in Claim 21, is missing from Claim 16. It appears that Claim 21 was intended to have the same meaning as claim 16.

The prosecution history supports the Court's understanding that the disputed claim language in Claims 16 and 21 refers to the conduit attachment brackets. Claims 16 and 21 in the issued '769 patent were Claims 22 and 27, respectively, in the original patent application.[3] Claims 22 and 27 in the patent application as originally filed with the USPTO did not contain the disputed claim language. On June 2, 1997, Dura's outside attorney Peter McDermott and in-house counsel Bob Roth had an in-person meeting with Primary Examiner Curtis Cohen and Assistant Examiner Jerry Redman of the USPTO. The Examiner Interview Summary Record has the following notes of the Examiners: "Discussed the guide boxes aligning the cable as discussed in the proposed claimed amendment." The Examiner's reference to "guides boxes" refers to the "cable directional blocks" referenced in a proposed amendment to certain claims of the patent application. (*See* June 12, 1997 Amendment In Response to Office Action and accompanying "Remarks" at pgs. 9-13.) On September 8, 1997, Dura's attorney Peter McDermott had another telephonic meeting with Primary Examiner Curtis Cohn to discuss the pending patent application. The Examiner Interview Summary Record states: "Discussed adding 'curved internal passageway' to claims 22 & 27. (See amendment). Applicant agreed. . . ." On September 11, 1997, the Examiners officially amended Claims 22 and 27 to include the disputed claim

---

[3] The USPTO typically renumbers the claims when it grants a patent from a patent application.

limitations, specifically adding "each forming a curved internal passageway" in Claim 22 and "each conduit forming a curved internal passageway" in Claim 27. The Examiner gave the following statement of reasons for allowance: "The specific limitation as to the conduit forming a curved internal passageway was discussed in an interview on 6/2/97. The examiner was convinced that this specific limitation, which was not included in the originally filed claims, is allowable since there is no teaching of a curved passageway in the cited art. Applicant's attorney filed an amendment that amends all but two of the independent claims and in the Remarks applicant's attorney argues that the curved internal passageway is not taught in the art. The examiner amended claims 22 and 27 to include this limitation and allowed all of the claims." From this prosecution history, the Examiners and Dura intended the language "each forming a curved internal passageway" and "each conduit forming a curved internal passageway" to mean that the conduit attachment brackets were somehow to perform similarly to the cable directional blocks in forming a curved internal passageway to guide the cable into the lower horizontal portion of the frame. However, how the conduit attachment brackets would perform this function is not explained in the prosecution history or in the patent's specification. It appears that the Examiners and Dura misunderstood the embodiments that were in pending Claims 22 and 27 (i.e., Claims 16 and 21 in the issued '769 patent), which deal the cable attachment brackets.

The conduit attachment brackets are illustrated in Figures 8 and 9, which are reproduced below:



**Fig. 8**



**Fig. 9**

The specification of the '769 patent provides a little background on the left and right conduit attachment brackets in column 9 starting at line 24, but this section does not provide any reference to conduit attachment brackets that have a "curved internal passageway." The specification of the '769 patent explains Figures 8 and 9 as follows:

FIG. 8 illustrates a left side conduit attachment bracket suitable for mounting to the lower horizontal portion of the frame. Bracket 76 is seen to have a mounting hole 78 for receiving a mounting rivet, screw or, more preferably, a mating stud projecting from the surface of the frame. Optionally multiple mating studs can be provided for positioning and affixing the bracket 76 to the frame. Such mating studs can be formed during initial molding of the frame as unitary nubs or projections from the surface of the frame. Right side frame 80 is seen in FIG. 9 also to have a mounting hole 82 suitable for receiving a mating stud projecting from the frame. In the alternative, studs or nubs can be formed on the brackets to be received into corresponding sockets or holes in the surface of the frame at the

mounting location. Left conduit attachment bracket 76 further comprises conduit flange 79 adapted to receive and releasably hold conduit end 56 of left side drive cable segment 44. Similarly, right conduit attachment bracket 80 has conduit flange 83 for receiving and releasably holding conduit end 52 associated with drive cable segment 42. In addition, drive cable guide 84 of bracket 80 serves to aid in guiding the drive cable from bracket 80 to its attachment to the slider pane.

('769 pat. col. 9 ll. 33-54.)

There is nothing in the patent's specification explaining how the "conduit attachment brackets" form "curved internal passageways" or what would be the purpose or scope for such a claim limitation. Although Dura argues that this claim limitation is actually referring to the actual "conduit", not the left and right conduit attachment brackets, Dura has not pointed to any particular section of the patent's written description or prosecution history to support its position. Nor has Dura explained where or how the conduit forms a curved internal passageway or the purpose of the passageway. In addition, the question of whether this claim limitation refers to the left and right conduit attachment brackets or the actual conduit also is a basis for rendering the claim indefinite.

Because the Court cannot understand what is claimed, or the scope or bounds of the claim, when the claim is read in light of the specification and prosecution history, the Court finds that this claim is indefinite under 35 U.S.C. § 112 ¶ 2. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005). Dura has not pointed the Court to any section of the patent's written description or patent's prosecution history to support its proposed interpretation of the claim limitation. This is not a case where the patentee simply failed to provide explicit antecedent basis for a term and the parties understand what the disputed claim language is referring to. *See Energizer Holdings, Inc*. v. ITC, 435 F.3d 1366, 1370 (Fed. Cir. 2006). Rather, this is a case where it is unclear what is claimed and the scope of what is claimed is unclear due to the way that the claim is drafted. Dura would have the Court rewrite this claim

to make it clear that it is the conduit, or a particular portion of the conduit, that forms a curved internal passageway. However, the Federal Circuit has admonished district courts from rewriting claims to preserve its validity. *Allen Engineering Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (declining to substitute the word "perpendicular" for "parallel" even if the mistake was obvious); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (holding that the Federal Circuit has "admonished against judicial rewriting of claims to preserve validity.").

### H. "FRAME MEMBER" IN CLAIMS 1, 2, 4, 10, AND 14 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 1.<br>"frame member" ('617 Patent – Claims 1, 2, 4, 10, 14 ) | Plaintiffs do not believe the phrase "frame member" in the '617 Patent requires construction by the Court.<br><br>However, should the Court determine that the term "frame member" requires construction, Plaintiffs suggest the following, consistent with the plain and ordinary meaning:<br>"frame" means "an open structure or rim for encasing, holding, or bordering something <window frame>"<br>"member" means "a distinct part of a whole" | component associated with or part of a circumferential (that is, outer peripheral) frame | component associated with or part of a frame |

The parties request that the Court construe the term "frame member" in Claims 1, 2, 4, 10, and 14 of the '617 patent.

By way of example, Claims 1 and 2, which contain the "frame member" claim limitation, read as follows:[4]

1. A sliding window assembly for a motor vehicle comprising, in combination: **a frame member** forming a channel having a length, a width, and a height; a guide bracket located at least partially within the channel and slideable along the length of the channel; a sliding pane; wherein the guide bracket forms a slot receiving an edge of the sliding pane so that the guide bracket carries the sliding pane between a closed position and an open position as the guide bracket and the slot move along the length of the channel; a pull-pull cable drive assembly operably secured to the guide bracket to move the sliding pane between the closed and open positions; and wherein **the frame member** forms an interference with the guide bracket to limit movement of the guide bracket in the direction of the height of the channel to limit movement of the guide bracket out of the channel.

2. The sliding window assembly according to claim 1, wherein the **frame member** has a bottom wall and a pair of side walls extending from opposite edges of the side wall to form the channel and opposed flanges inwardly extending from the side walls to form the interference with the guide bracket.

Figure 1 of the '617 illustrates an embodiment of the "frame member", specifically a "lower frame member" 20 of the "circumferential frame" 12. Figure 1 is reproduced below:



*Fig. 1*

---

[4] Claims 1 and 2 have been combined in the pending reexamination as amended Claim 3, with former Claims 1 and 2 having been cancelled. However, the relevant language for the claims has not changed.

Dura argues that "frame member" does not need to be construed by the Court. However, in its reply brief, Dura takes a fall back position that should the Court determine that the term "frame member" requires construction, Dura proposes standard dictionary definitions. According to Dura, a standard dictionary definition for "frame" is "an open structure or rim for encasing, holding, or bordering something <window frames>" and a standard dictionary definition for "member" is "a distinct part of a whole".

Magna argues that "frame member" should be construed to mean "component associated with or part of a circumferential (that is, outer peripheral) frame." (Magna resp., p. 18, D.E. 411.)

Dura argues that Magna's proposed construction improperly narrows the claims to require a "circumferential" and "outer peripheral" frame member because the claim language does not contain the limitations.

The Court agrees with Dura that the term "circumferential" should not be read into the construction of "frame member." According to *Phillips*, when interpreting claim terms, the Court should focus on the language of the claims. In this case, the inventors chose to use the language "frame member" instead of circumferential frame member," which implies that Claim 1 can encompass circumferential and non-circumferential frames.

The Court's understanding that "circumferential" should not be read into construction of "frame member" is supported by Claims 8 and 9, which are dependent claims that add additional claim limitations. Claims 8 and 9 state as follows:

8. The sliding window assembly according to claim 1, further comprising **a circumferential frame** surrounding the sliding pane and a pair of fixed panes.

9. The sliding window assembly according to claim 8, **wherein the circumferential frame** includes a bottom portion forming a frame channel and

the frame member is at least partially located within the frame channel of the bottom portion.

By using the language "circumferential frame" in dependent claims 8 and 9, but not in Claim 1, the inventors imply that Claim 1 does not necessarily have to be associated with a circumferential frame, but rather can be associated with a non-circumferential frame.

> "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. …For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."

*Phillips v. AWH Corp.*, 415 F.3d at 1314-15 (Fed. Cir. 2005) (en banc).

Accordingly, the Court construes the term "frame member" similar to Magna's proposed construction, but without the reference to "circumferential." Specifically, the Court construes "frame member" to mean "component associated with or part of a frame."

## I. "CIRCUMFERENTIAL FRAME" IN CLAIMS 8 AND 9 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 2. "circumferential frame" ('617 Patent – Claims 8, 9) | "circumferential frame": a frame at or near the periphery of the window that does not require a full-circumference member. | outer peripheral frame | This claim term does not need to be construed at the present time as other words in the claim state that the circumferential frame surrounds the "sliding pane a pair of fixed panes." |

The parties request that the Court construe the term "circumferential frame member" in Claims 8 and 9 of the '617 patent.

The relevant portions of these claims are as follows:

8. The sliding window assembly according to claim 1, further comprising **a circumferential frame** surrounding the sliding pane and a pair of fixed panes.

9. The sliding window assembly according to claim 8, wherein the **circumferential frame** includes a bottom portion forming a frame channel and the frame member is at least partially located within the frame channel of the bottom portion.

An embodiment of the "circumferential frame" is illustrated in Figure 1 of the '617 patent with the reference number 12 shown below.



*Fig. 1*

The Court previously construed the phrase "circumferential frame" in part when deciding a motion for summary judgment as to whether Magna's accused product infringed the '617 patent. (Opinion at 20-22, Doc. No. 348.) In denying Magna's motion for summary judgment, the Court rejected Magna's argument that "circumferential frame" means that the frame must necessarily surround the "entire" body of the windows because such a construction would be at odds with the language in the specification describing the preferred embodiment. *Id.* at 20-21.

Specifically, the detailed description of the "preferred embodiment" section of the '617 patent states:

> The **circumferential frame** 12 preferably includes at least **one unitary full-circumference member** extending all the way around the perimeter.

('617 Pat. col. 4, ll. 23-26.)  The Court reasoned that the inventors preferred that the term "circumferential frame" include "at least one unitary full-circumference member extending all the way around the perimeter," but did not necessarily require a full-circumference member be utilized.  The Court reasoned that "circumferential" and "full-circumferential" should not be construed to have the same meaning.  Accordingly, the Court rejected Magna's argument that the "circumferential frame" claim language requires that the frame entirely surround the glazing windows.  The Court stated: "Exactly how much of the perimeter must be completed to be 'substantially complete' is open to interpretation, and is a question of fact which remain to be decided in the case."  (Opinion & Order at p. 21, Doc. No. 348.)

However, after considering the evidence submitted and studying the patent further, the Court feels that it must slightly modify its previous construction.  Because the '617 patent is unrelated to the '769 patent, the Court must generally construe "circumferential frame" in the '617 patent separate and apart from "circumferential frame" in the '769 patent.  These patents have different inventors and the patents do not claim priority to a common patent application.

The only claims in the '617 patent having the term "circumferential frame" are Claims 8 and 9, which have explicit language requiring a circumferential frame "surrounding the sliding pane and a pair of fixed panes."  (Claims 8 and 9, '617 Patent, col. 10 ll. 29-36.)

Dura argues that "circumferential frame" should be construed to mean "a frame at or near the periphery of the window that does not require a full-circumference member."

Magna argues that "circumferential frame" should be construed to mean "outer peripheral frame." Neither Dura nor Magna provided extensive analysis for its proposed interpretation in their prehearing briefs to the Court.

The "Background of the Invention" of the '617 patent provides relevant context for interpreting "circumferential frame" in the '617 patent. Specifically, the "Background of the Invention" section states:

> Motor vehicle window assemblies having one or more sliding panes, that is, panes which slide either substantially horizontally or vertically with respect to the window assembly, may be either manually operated or operated by an electric motor. Such window assemblies are used, for example, as rear slider windows for pick-up truck cabs, typically having a **circumferential (that is, outer peripheral) frame** in which are mounted one or more sliding panes along with one or more fixed panes.

('617 Pat., col. 1 ll. 23-31.) The '617 patent's written description does not have the language that is contained in the '769 patent which defines circumferential to means "complete or substantially complete perimeter around the glazing panes." The definitional phrase which is in the '769 patent is not contained in the '617 patent.

The Court finds that the language of Claim 8 specifically states what is meant by "circumferential frame." Claim 8 states a "circumferential frame surrounding the sliding pane and a pair of fixed panes." The language of Claim 8 following "circumferential frame" defines what is meant by this claim term. Accordingly, the Court construes "circumferential frame" in Claims 8 and 9 as follows: "a frame that surrounds the sliding pane and a pair of fixed panes." The Court's analysis is consistent with the teachings of the Federal Circuit. In *Phillips*, the Federal Circuit stated that "the context in which a term is used in the asserted claim can be highly instructive" in determining the meaning of the dispute claim term. *Phillips*, 415 F.3d at 1314. "While certain terms may be at the center of the of claim construction debate, the context

of the surrounding words of the claim also be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. The Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Here, the words after the claim term "circumferential frame" make clear that the circumferential frame surrounds the sliding pane and a pair of fixed panes.

The specification of '617 patent does not contain the same "complete or substantially complete" language to define "circumferential frame" as is contained in the '769 patent's written description, and the Court will not use language in the '769 patent to define the '617 patent because the patents are unrelated.

The Court previously found that the following language supported a claim construction that the circumferential frame need not entirely surround the sliding pane and fixed panes:

> The sliding pane 18 and the left and right fixed panes 14, 16 are mounted in the circumferential frame 12. The circumferential frame 12 has substantially vertical left and right frame portions 28, 30, respectively, interconnected by substantially horizontal top and bottom frame portions 32, 34. The **circumferential frame** 12 **preferably includes at least one unitary full-circumference member extending all the way around the perimeter**. The full circumference member 12 can be formed by injection molding in place around the fixed position panes. The circumferential frame 12 can be formed of any suitable material such as, for example, a plastic. A suitable plastic is, for example, GELOY which is available from the General Electric Company. Optional left and right mullions 36 can be positioned at the junction of the sliding pane 18, in its closed position, with the left and right fixed panes 14, 16, respectively.

The above embodiment in the written description is describing a preferred embodiment where the circumferential frame is formed as a one-piece or unitary structure. The "full-circumference" language is only emphasizing or making clear that the circumferential frame is preferably a one-piece molded component.

In Dura's Supplemental Claim Construction Brief that Dura filed after the claim construction hearing, Plaintiff asks the Court to construe "surround" to mean "a partially surrounding frame." Dura provided the Court with a general dictionary definition for "surround"

as meaning "to cause to be encircled on all or nearly all sides." (Ex. A to Plaintiffs' August 2, 2010 Supplemental Claim Construction Br.) The Court finds that the term "surrounding" does not need to be construed at this time because the term is a common word that jurors will understand. Dura does not claim that the '617 patent or its prosecution history sets forth any special definition for the term "surrounding," but rather Dura simply asks that the Court select one of many possible general dictionary definitions. In *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804-06 (Fed. Cir. 2007), the Federal Circuit held that it is proper to allow a jury in its infringement analysis to apply its understanding of ordinary words in the context of the invention. If, before trial, the Court needs to refine its interpretation the Court will do so. However, the Court feels its construction is clear and unambiguous. Moreover, the Court notes that if Dura wanted to put a qualifying word such as "partially" or "substantially" before the term "surrounding" when it drafted claim 8, it could have done so. At the present time, the Court feels that a jury can adequately apply this claim construction in the context of the specific accused device.

### J.     "SUPPORTED BY" IN CLAIM 3 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 4. "the guide bracket is at least partially supported by the flanges" ('617 Patent – Claim 3) | the flanges at least partially support the guide bracket. | carried and held up by<br><br>Alternative: that the flanges hold up the guide bracket in position so as to keep the guide bracket from falling, sinking, or slipping. | The flanges at least partially support the guide bracket. |
| 5. "supported by" ('617 Patent – Claim 3) | Plaintiffs do not believe this phrase requires construction by the Court. | carried and held up by<br><br>Alternative: that the flanges hold up the guide bracket in | The flanges hold the guide bracket in position so as to keep the guide bracket |

| | However, should the Court determine that the term "supported by" needs to be separately construed, Plaintiffs suggest the following, consistent with the plain and ordinary meaning: "held in position by so as to keep from falling, sinking, or slipping." | position so as to keep the guide bracket from falling, sinking, or slipping. | from falling, sinking, or slipping.<br><br>At least a pair of opposed flanges must both form the interference with the guide bracket and at least partially support the guide bracket. The "open" nature of Claim 3 means that Claim 3 would cover additional flanges that only support the guide bracket. |

The parties request that the Court construe the term "supported by" in Claim 3 of the '617 patent.

Claim 3 of '617 reads:

3.     The sliding window assembly according to claim 2, wherein the guide bracket is at least partially **supported by** the flanges and slides along the flanges as the sliding pane is moved between the closed and open positions.

Claim 3 is a dependent claim that relates back to Claim 2, which describes the "flanges" as forming an interference with the guide bracket.  Claim 2 reads as follows:

2.  The sliding window assembly according to claim 1, wherein the frame member has a bottom wall and a pair of side walls extending from opposite edges of the side wall to form the channel and opposed flanges inwardly extending from the side walls to form the interference with the guide bracket.

Figure 2 of the '617 patent, which is reproduced below, illustrates an embodiment of the invention of Claim 3:



**Fig. 2**

The guide bracket is shown with the reference number 22. The flanges are shown with reference number 44. The sliding pane 18 fits into the guide bracket 22.

Claims 2 and 3 together require opposed flanges that extend from the side walls to form an "interference" with the guide bracket and at least partially support the guide bracket. Figure 2 of the patent above, shows the flanges 44 forming an interference between the body of the guide bracket 22 and the legs 54. The patent's written description explains the interference as follows:

> The guide bracket 22 is mechanically locked or secured to the lower frame member 20 to limit vertical movement of the guide bracket 22 relative to the lower frame member 20. The illustrated guide bracket 22 is secured to the lower frame member 20 with an interference formed by a snap-fit engagement or connection. The snap-fit connection eliminates the need for separate fasteners and makes installation quicker. The snap-fit connection relies upon the resiliency or position memory of at least one flexible deformable member of a component to establish a position locking location relative to a corresponding member or orifice in the other member. Typically and preferably this is accomplished by simply pushing the two components together.

('617 pat. col. 5-6 ll. 56-1.) The interference fit prevents the guide bracket from moving vertically out of the lower frame member 20. (*Id*. at col. 2 ll. 7-10.) According to the invention of Claim 3, the flanges 44 suspend the guide bracket 22 off the bottom of the lower frame

57

member 20 so that if dirt or rocks get into the bottom of the lower frame the dirt and rocks will not obstruct the movement of the guide bracket. The claim limitation specifying that the guide bracket is "supported by" the flanges is referring to the fact that the flanges suspend the guide bracket off the bottom wall 38 of the lower frame member 20.

The Court previously construed the phrase containing the "supported by" language in its opinion denying Magna's motion for summary judgment of non-infringement. Magna argued in its motion for summary judgment that its GMT900 power sliding rear window does not infringe upon the '617 patent because the GMT900 does not include a guide bracket "at least partially supported by the flanges," as required by Claim 3 of the '617 patent. In denying Magna's motion for summary judgment, the Court construed the phrase "wherein the guide bracket is at least partially supported by the flanges" to mean that the "flanges 'at least partially support' the guide bracket." (Opinion Order p. 9, Doc. No. 348.) Magna now requests that the Court construe "supported by" separately from the larger phrase.

In its opening claim construction brief, Dura argued that the claim language does not need to be construed or, in the alternative, that the "flanges may hold the guide bracket in position so as to keep the guide bracket from falling, sinking, or slipping."

In its response brief, Magna argues that the proper construction of "supported by" is "carried and held by," which Magna says is the plain and ordinary meaning. In support of its proposed construction, Magna generally directed the Court to "Figures 2, 5, and 6 and column 5, lines 50-55 of the '617 patent. Magna also refers to 2002 Webster's New World Dictionary and Thesaurus: support – to carry the weight of; hold up." (Magna resp. br. p. 11, Doc. No. 411.) Column 5 lines 50-55 of the '617 patent state:

> A bottom surface 52 of the guide bracket 22 is generally planar and sized to engage the upper surfaces 46 of the lower frame member flanges 44 so that the

> guide bracket 22 is **supported by** the flanges 44 and is longitudinally slideable along the flanges 44 within the channel 42.

Magna, however, says that it would agree to Dura's proposed alternative definition, "flanges may hold the guide bracket in position so as to keep the guide bracket from falling, sinking, or slipping," if the word "may" is removed. (*Id.*) Magna points out that "may" in Dura's proposed construction means that the construction is optional and contrary to the claim language which requires that the flanges "at least partially" support the guide bracket. (*Id.*)

In its reply brief, Dura appears to concede to Magna's argument and changes its alternative construction of "supported by" to mean "held in position by so as to keep from falling, sinking, or slipping."

Because the parties appear to be in substantial agreement as to the proper construction of "supported by," the Court construes "supported by" to mean that "the flanges hold the guide bracket in position so as to keep the guide bracket from falling, sinking, or slipping."

At the claim construction hearing and in briefing following the claim construction hearing, the parties raised the issue of whether the flanges that form the interference with the guide bracket and the flanges that at least partially support the guide bracket must be the same set of flanges or whether different flanges can perform the "interference" and the "supporting" functions. To better understand the dispute, it is helpful to look at the accused product (GMT900), which is depicted below.



(Magna's Summary Judgment Motion [Doc. No. 202], p. 10)(arrows and labels added))

The accused device uses two different sets of flanges, a small upper pair of flanges and a lower larger pair of flanges. In its summary judgment motion, Magna argued that "[t]he side flanges of the GMT900 operate from the sides to provide interference and secure the guide bracket from lifting out of the channel; however [the] GMT900 is supported by a second, larger pair of flanges which are located completely below the guide bracket." (Doc. No. 202 p. 10.) In other words, Magna argues that the same flanges must perform the interference and at least partially support the guide bracket.

Dura argues that even if Magna is factually correct in that the interference flanges of the GMT900 do not partially support the guide bracket, this distinction is irrelevant because Claim 3 of the '617 patent does not require that the same flanges form the interference and at least partially support the guide bracket. According to Dura, Claim 3 means that the supporting function recited in Claim 3 is performed by one or more of the "opposed flanges inwardly extending from the side walls," recited in Claim 2. In other words, Dura argues that different flanges can form the interference with the guide bracket and at least partially support the guide bracket.

Magna argues on the other hand that the flanges being referred to in Claim 3 as "at least partially supporting" the guide bracket, are the same flanges that form the interference that is recited in Claim 2.  In other words, Magna argues that according to the way that claims are drafted, the same flanges are to perform the interference fit and support the guide bracket.  In support of its argument, Magna relies on the fact that Claim 3 is a dependent claim that depends from Claim 2 and that the language "the flanges" in Claim 3 refers to the same flanges that are introduced in Claim 2 that form the interference.  Magna relies on the patent drafting convention of "antecedent basis."

> 2.  The sliding window assembly according to claim 1, wherein the frame member has a bottom wall and a pair of side walls extending from opposite edges of the side wall to form the channel and **opposed flanges** inwardly extending from the side walls to form the interference with the guide bracket.

> 3.     The sliding window assembly according to claim 2, wherein the guide bracket is at least partially supported by **the flanges** and slides along the flanges as the sliding pane is moved between the closed and open positions.

Under the patent drafting convention of having "antecedent basis," the patent drafter will use an identifier such as "said" or "the" when referring back to the previously introduced claim element.  In this case, Magna argues that the patent drafter, by using the term "the" in front of the term "flanges" in Claim 3, the drafter was referring back to the "opposed flanges" language in Claim 2.

Magna also notes that there is not any suggestion or discussion in the specification of the '617 patent of using different flanges to perform the functions of forming the interference with the guide bracket and supporting the guide bracket.  The only embodiment described in the '617 patent for "opposed flanges" shows a pair of opposed flanges with each of the flanges

performing both functions of forming the interference with the guide bracket and supporting the guide bracket. This can be seen in Figure 2 of the '617 patent shown above.

Dura responds by arguing that "although the opposed flanges of the frame member must <u>collectively</u> form the interference with the guide bracket and at least partially support the guide bracket, <u>there is no requirement that every flange must perform both functions</u>." (Pl.'s Reply to Def.'s Supp. Claim Construction Br. at p. 1, Doc. No. 430.)

The Court finds this claim construction issue to be a close question. Both parties have presented good arguments in support of their positions.

Based on the structure of Claims 2 and 3, the Court agrees with Magna that the claim term "the flanges" in Claim 3 refers to the flanges introduced in Claim 2. Claim 2 states that a set of opposed flanges forms the interference with the guide bracket. Thus, Claim 3 is referring to the same set of flanges that form the interference with guide bracket. Because Claim 3 has the open transition phrase "comprising," a device with additional flanges that only support the guide bracket could infringe Claim 3. The Court holds that at least a pair of opposed flanges must both form the interference with the guide bracket and at least partially support the guide bracket, but that infringing products can have additional flanges that only support the guide bracket.

The Court notes that the '617 patent only describes an embodiment where at least a pair of opposed flanges both forms the interference with the guide bracket and supports the guide bracket.

Dura also introduced evidence that shortly after the Court's claim construction hearing it filed a "Supplemental Statement" in the reexamination proceeding of the '617 patent to "clarify" how this claim construction issue should be construed. Dura filed the statement in the

reexamination proceeding on the same day, August 18, 2010, that it filed its Motion for Leave to

File a Reply to Defendant's Supplemental Claim Construction Brief. The statement states:

<u>Supplemental Statement Concerning Claim 3 & 4</u>

By way of clarification, the flanges in Claims 3 & 4 collectively form an interference with the guide bracket and support the guide bracket, however, each flange need not perform both recited tasks and both recited tasks need not be performed at the same time regardless of which ones of the recited flanges performs the tasks. See, for example, Figs. 2, 3, 5, and 6. By way of further clarification, the language of claim 3:

> wherein the frame member forms an interference with the guide bracket to limit movement of the guide bracket in the direction of the height of the channel to limit movement of the guide bracket out of the channel, wherein the frame member has a bottom wall and a pair of side walls extending from opposite edges of the bottom wall to form the channel and opposed flanges inwardly extending from the side walls to form the interference with the guide bracket, wherein the guide bracket is at least partially supported by the flanges and slides along the flanges as the sliding pane is moved between the closed and open positions.

means that although the opposed flanges of the frame member must collectively form the interference with the guide bracket and at least partially support the guide bracket, there is no requirement that each of the flanges must perform both functions only that the flanges collectively perform the function. Also, there is no requirement in the claim that both functions must be performed at the same time. This is also made clear by claim 4 where the guide bracket has a pair of opposed outwardly extending legs which are located between the flanges and the bottom wall of the frame member to form the interference. Thus, the language of claim 3 clearly does not require that all flanges must form the interference with the guide bracket and support the guide bracket, only that the collective flanges must perform this function.

The Court that finds that if it were to give effect to the above "clarification" statement,

the statement could raise a question as to the validity of the claim. 35 U.S.C. § 305 states:

> In any reexamination proceeding under this chapter, the patent owner will be permitted to propose any amendment to his patent and a new claim or claims thereto, in order to distinguish the invention as claimed from the prior art cited under the provisions of section 301 of this title, or in response to a decision adverse to the patentability of a claim of a patent. No proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under the chapter.

According to 35 U.S.C. § 305, a claim cannot be broadened through a reexamination proceeding. Moreover, under § 305, the patent owner is only permitted to propose any amendment "to distinguish the invention as claimed from the prior art cited under the provisions of section 301 of this title, or in response to a decision adverse to the patentability of a claim of a patent." In this case, Dura's statement raises questions regarding whether it may violate these provisions of § 305.

The Court also recognizes that the statement made in the reexamination seems to be directed at this litigation. As Magna has pointed out, there is case law that holds that self-serving statements in reexamination proceedings directed solely at affecting ongoing litigation can be given less weight or no more weight than the testimony of an interested witness or argument of counsel. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 141 F. Supp. 2d 288, 298 (D. Conn. 2001) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986)). At the time Dura made the statement, the pending claim in the reexamination proceeding was only objected to for typographical errors. Therefore, it appears that Dura's statement was directed at affecting this litigation.

## K. "OUTWARDLY EXTENDING LEGS" IN CLAIM 4 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 6. "outwardly extending legs" ('617 Patent – | a pair of outwardly extending legs. | Agreed to Dura's proposed construction | A pair of outwardly extending legs. |

| | | | |
|---|---|---|---|
| Claim 4) | | at oral argument. | |

Magna had requested that the Court construe the phrase "outwardly extending legs" in Claim 4 of the '617 patent. At oral argument, the parties agreed to Dura's proposed construction. Accordingly, the Court construes "outwardly extending legs" to mean "a pair of outwardly extending legs."

### L. "SLIDING WINDOW ASSEMBLY" IN CLAIMS 10 AND 14 OF THE '617 PATENT

In its response brief, Magna had requested that the Court construe the claim term "sliding window assembly" in the preambles of Claims 10 and 14 of the '617 Patent. At the claim construction hearing, Dura and Magna agreed that this claim limitation is no longer in dispute. (July 22, 2010 Transcript at pgs. 96-99.)

### M. "TRANSITION BLOCK" IN CLAIMS 10 AND 14 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 14. "transition block" ('617 Patent – Claims 10, 14) | Plaintiffs do not believe the phrase "transition block" requires construction by the Court. | box that permits movement (transition) of a conduit portion | This claim limitation does not need to be construed at this time. |

Magna requests that the Court construe the term "transition block" in Claims 10 and 14 of the '617 patent.

The relevant portions of Claims 10 and 14 are reproduced below:

10. A sliding window assembly for a motor vehicle comprising, in combination:

a frame member forming a channel having a length, a width, and a height; a guide bracket located at least partially within the channel and slideable along the length of the channel;

a sliding pane carried by the guide bracket between a closed position and an open position; a pull-pull cable drive assembly operably secured to the guide bracket to move the sliding pane between the closed and open positions;

wherein the drive assembly includes a drive motor, a drive drum rotatable by the drive motor, and a drive cable connecting ends of the guide bracket with the drive drum such that rotation of the drive drum in one direction pulls the guide bracket and the sliding pane toward the open position and rotation of the drive drum in the other direction pulls the guide bracket and the sliding pane toward the closed position;

**first and second transition blocks** located at least partially within the channel of the frame member at opposite ends of the frame member and movable in a direction along the length of the channel;

wherein **the first and second transition blocks** each form a passage <u>receiving an end of a conduit portion of the drive cable and through which a core portion of the drive cable passes to the guide bracket</u>; and

wherein the frame member forms a first interference with **the transition blocks** to limit movement of **the transition blocks** in the direction along the height of the channel, the frame member forms a second interference with each **of the transition blocks** to limit movement of **the transition blocks** in the direction toward a center of the channel along the length of the channel, and the frame member forms no interference against movement of **the transition blocks** in the direction away from the center along the length of the channel.

14. A sliding window assembly for a motor vehicle comprising, in combination:

a frame member forming a channel having a length, a width, and a height;

a guide bracket located at least partially within the channel and slideable along the length of the channel;

a sliding pane carried by the guide bracket between a closed position and an open position;

a pull-pull cable drive assembly operably secured to the guide bracket to move the sliding pane between the closed and open positions;

wherein the drive assembly includes a drive motor, a drive drum rotatable by the drive motor, and a drive cable connecting ends of the guide bracket with the drive

drum such that rotation of the drive drum in one direction pulls the guide bracket and the sliding pane toward the open position and rotation of the drive drum in the other direction pulls the guide bracket and the sliding pane toward the closed position;

**first and second transition blocks** located at least partially within the channel of the frame member at opposite ends of the frame member and each forming a passage through which the drive cable passes;

wherein the frame member forms a first interference with **the transition blocks** to limit movement of **the transition blocks** in the direction along the height of the channel, the frame member forms a second interference with each of **the transition blocks** to limit movement of **the transition blocks** in the direction toward a center of the channel along the length of the channel, and the frame member forms no interference against movement of **the transition blocks** in the direction away from the center along the length of the channel; and

wherein each of **the transition blocks** are secured to the frame member with a snap-fit connection.  (Emphasis added.)

An exemplary embodiment of a transition block 26 is best shown in Figures 8, 9, and 10 of the '617 patent, which are reproduced below, and the transition block is described in the "Detailed Description of Certain Preferred Embodiments" section of the '617 patent in some detail.  Figures 1 and 3-5 also show elements of the exemplary transition block.  In the drawings, the transition block is used to transition from a conduit surrounding a drive cable to just a naked drive cable and through which the drive cable passes to connect to the guide bracket inside the channel of the frame member.  The transition block is designed to at least partially fit in the channel of the lower frame member 20.  A transition block is located at each end of the lower frame member 20.



Fig. 8

Fig. 9

Fig. 10

Dura argues that the claim term "transition block" does not need to be construed because its meaning would be clear to a person of ordinary skill in the art.

Magna argues that "transition block" should be interpreted to mean "box that permits movement (transition) of a conduit portion." At oral argument, Magna argued that the transition block should be construed to allow "transition" or movement of a conduit up and down as shown

for example in the third portion 104 of the transition block of Figure 10.   (July 22, 2010 Transcript at p. 106.)

The Court disagrees with Magna's proposed construction.  The Court finds that this term does not need to be construed as the claims themselves set forth what is the function of the transition block in the claims.  The language of the claims adequately set forth what is meant by transition block.  For example, Claim 10 states: "wherein the first and second transition blocks each form a passage receiving an end of a conduit portion of the drive cable and through which a core portion of the drive cable passes to the guide bracket [in the frame member]. . . ."  Likewise Claim 14 states: "first and second transition blocks located at least partially within the channel of the frame member at opposite ends of the frame member and each forming a passage through which the drive cable passes. . . ."  The Court notes that the parties did not fully explain how this claim limitation relates to the accused products.  If, before the trial, the Court feels that it needs to refine its construction based on a better understanding of the accused products, the Court can do so.  However, the Court holds that the term "transition block" does not need to be construed at this time.


### N.       "SNAP-FIT CONNECTION" IN CLAIM 14 OF THE '617 PATENT

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| 15. "snap-fit connection" ('617 Patent – Claim 14) | Plaintiffs do not believe the phrase "snap-fit connection" requires construction by the Court. | a connection that relies upon the resiliency or position memory of at least one flexible or deformable member of a component to establish a position locking location relative to a corresponding member or orifice in the other member. | The claim limitation does not need to be construed at this time. |

The parties request that the Court construe the term "snap-fit connection" in Claim 14 of the '617 patent.

The relevant portion of Claim 14 is produced below:

14. A sliding window assembly for a motor vehicle comprising, in combination:

\*       \*       \*

wherein each of the transition blocks are secured to the frame member with **a snap-fit connection**.

Magna argues that the claim term "a snap-fit connection" should be construed to mean "a connection that relies upon the resiliency or position memory of at least one flexible or deformable member of a component to establish a position locking location relative to a corresponding member or orifice in the other member."

Dura argues that "a snap-fit connection" does not need to be construed.

The written description of the '617 patent provides the following explanation of "snap-fit connection" in the detailed description of the preferred embodiments section:

The illustrated transition block 26 is secured to the lower frame member 20 with an interference formed by a snap-fit engagement or connection. The snap-fit connection eliminates the need for separate fasteners and makes installation quicker. **The snap-fit connection relies upon the resiliency or position memory of at least one flexible or deformable member of a component to establish a position locking location relative to a corresponding member or orifice in the other member.** Typically and preferably this is accomplished by simply pushing the two components together. The illustrated transition block 26 is provided with a pair of opposed longitudinally extending horizontal grooves 106 in the side surfaces 90. The illustrated grooves 106 are generally semi-circular in cross-section and are sized and shaped to cooperate with the protrusions 50 on the side walls 40 of the lower frame member 20. The grooves 106 are spaced apart from the bottom surface 108 of the transition block 26 a distance such that the transition block bottom surface 108 rests upon the flanges 44 of the lower frame member 20 when the protrusions 50 are within the grooves 106. One or both of the transition block 26 and the lower frame member 20 are preferably formed of a

resilient material so that the transition block 26 can be snap-fit into the lower frame member 20 by pushing the transition block 26 into the channel 42 as one or both of the protrusions 50 and grooves 106 deflect to permit the protrusions 50 to pass into the grooves 106 and then resiliently snap back into their interfering position to limit vertical movement of the transition bracket 26 relative to the lower frame member 20. Preferably, the interference substantially prevents vertical movement of the transition block 26 relative to the lower frame member 20. It is noted that the transition block 26 can alternatively be inserted into the lower frame member 20 by longitudinally sliding into the channel 42 from one of the ends of the channel.

('617 pat. col. 8 ll. 15-49 (emphasis added.))

The Court holds that this claim term does not need to be construed at the present time. The Court believes that the jury will understand the term "snap-fit" in the context of this invention. Specifically, the Court holds that a jury will be able to determine whether the accused products have a transition block that is secured to the frame member with a "snap-fit connection." While Magna's proposed construction appears to be consistent with the teachings of the written description of the '617 patent, the Court does not want to import limitations from the written description into the claims. The Court notes that the parties did not adequately explain how this claim limitation relates to the accused products. According to Federal Circuit precedent, the Court is to construe the disputed claim limitations in the context of the accused products. Otherwise, the Court's opinion is similar to an advisory opinion. *Lava Trading, Inc. v. Sonic Trading Management*, LLC, 445 F.3d 1348, 1350 (Fed. Cir. 2006); *see also Jang v. Boston Scientific Corp.*, 532 F.3d 1330, 1337-1338 (Fed. Cir. 2008). If before the trial, the Court feels that it needs to construe this term after having a better understanding of the infringement and non-infringement positions as they relate to the accused products, the Court can do so. However, the Court holds that the term "snap-fit" does not need to be construed at this time because a jury can understand if the accused product has a transition block that is secured to the frame member with a "snap-fit connection."

## V. CONCLUSION

The Court hereby construes the disputed claim terms as set forth above.

SO ORDERED

Dated:  October 25, 2010                          s/ Sean F. Cox
                                                  Sean F. Cox
                                                  U. S. District Judge

I hereby certify that a copy of the foregoing document was served upon counsel and/or the parties of record by electronic and/or First Class Mail on October 25, 2010.

Dated:  October 25, 2010                          s/ Jennifer Hernandez
                                                  Case Manager